IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NIDIA SOLANO-SANCHEZ | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 19-4016 |
| | : | |
| STATE FARM MUTUAL AUTO | : | |
| INSURANCE COMPANY | : | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                    December 16, 2022

Presently before the Court is a Motion for Partial Summary Judgment ("MSJ") filed by Defendant State Farm Mutual Auto Insurance Company ("Defendant" or "State Farm"). (Doc. 68.) Plaintiff Nidia Solano-Sanchez ("Plaintiff" or "Sanchez") filed a response in opposition to Defendant's MSJ (Doc. 70), to which Defendant filed a reply. (Doc. 71.)  For the reasons set forth below, State Farm's MSJ shall be **GRANTED**.

## I.    INTRODUCTION

This litigation arises out of a motor vehicle accident that occurred on October 12, 2016, in Reading, Pennsylvania. Plaintiff was the driver of the third car in a three-vehicle accident. As a result of a chain reaction, Plaintiff was rear-ended by the second vehicle, which was in turn rear-ended by the first vehicle. The driver of the first vehicle has admitted liability as the tortfeasor. Plaintiff claims she suffered injuries to her back, spine, and neck as a result of the accident. She sought medical treatment immediately after the accident and continues to seek treatment for back injuries that she claims were caused by the accident. State Farm questioned this claim, as Plaintiff denied experiencing back pain immediately after the accident, there was minimal damage to her car, and the hospital records failed to adequately support that her back injury was caused by this

accident. At the time of the accident, she was covered by a State Farm policy which provided for risk of harm caused by an underinsured motorist. That underinsured motorist, the tortfeasor here, was insured but only up to a limit of $15,000. Plaintiff then accepted that $15,000 and filed a claim with State Farm under her policy which also had a limit of $15,000, but with the benefit of stacking provided coverage up to a $45,000 limit. Before they would tender benefits under the policy, however, State Farm exercised its right to investigate the underinsured motorist ("UIM") claim. They conducted a statement under oath, collected medical records, and performed an independent medical evaluation ("IME") of Plaintiff to determine the extent of her injuries. Upon completion of the investigation, State Farm valued Plaintiff's claim at $21,000, $15,00 of which was paid by the tortfeasor and $6,000 that would come from UIM coverage. Plaintiff filed suit in this Court against State Farm, asserting breach of contract, bad faith and seeking a declaratory judgment regarding her coverage under the policy.

Plaintiff asserts that State Farm delayed its investigation from the start, took too long to complete the investigation, and made an unreasonably low settlement offer. Defendant now seeks summary judgment on the bad faith claim.

## II.    FACTUAL BACKGROUND[1]

### A.  The Accident

On October 12, 2016, Sanchez was the "driver of the last car in a three-vehicle, rear end, automobile accident" in Reading, Pennsylvania.[2] (Doc. 68-2 at 1.)



According to the police report, the accident occurred when Sanchez, in Vehicle 3, suddenly "started to slow down to let a vehicle that was exiting the shopping center into traffic." (Doc. 68-4, Def. Ex. 2.) Vehicle 2 braked to try to avoid her, but Vehicle 1 was "driving too fast for

---

[1] Plaintiff neither submitted her own statement of facts nor refuted State Farm's Statement of Material Facts. (Doc. 68-3.)

[2] To visualize the relative positions of the three vehicles involved in the accident, we include a graphical depiction of the accident from the police report. (Doc. 68-4, Def. Ex. 2.) We adopt the same numbering scheme used in the depiction throughout this memorandum opinion. Sanchez was the driver of "Unit 3" which we refer to as "Vehicle 3" and the tortfeasor was the driver of "Unit 1" which we refer to as "Vehicle 1."

conditions" and rear-ended Vehicle 2, causing Vehicle 2 to rear-end Vehicle 3. (*Id*.) The damage to Vehicle 3 was described as "[m]inor (driveable)" in the police report.[3] (*Id*.)

After the impact, Sanchez and the tortfeasor were taken by ambulance to Reading Hospital to be evaluated.[4] (Doc. 68-3, *Def. Statement of Material Facts* at ¶ 6.) While in the emergency room, Sanchez complained of neck pain, primarily on her left side, and pain in her left shoulder. (Doc. 68-4, Def. Ex. 4.) She denied hitting her head, losing consciousness, or experiencing any headaches or dizziness. (*Id*.) Sanchez also denied experiencing pain in her elbows, wrists, arms, and legs. (*Id*.) She said she was able to "walk well" at the scene of the accident. (*Id*.) She did not experience any bleeding or have open wounds. (*Id*.)

A CT scan and an X-ray were taken to further evaluate Sanchez' condition. (*Id*.) A CT scan of her cervical spine showed "no acute osseous abnormality," "mild multilevel degenerative changes," and no evidence of a fracture. (*Id*.) After an X-ray, the treating medical provider found that she did not break any bones in her shoulder area, diagnosed her with a "neck strain" and a "left shoulder strain," and prescribed ice and over-the-counter Motrin for pain. (*Id*.) Sanchez' discharge paperwork instructed her to follow up with her primary care provider and advised her to return to the ER if her condition worsened. (*Id*.)

Plaintiff was insured under a State Farm automobile policy. (Doc. 68-3, *Def. Statement of Material Facts* at ¶ 3.) As directed by the policy, she promptly notified State Farm two days after the October 12, 2016, date that it occurred. (*Id*. at ¶ 8.) The insurer opened a first party medical

---

[3] The damage to Vehicle 2 was also described as "[m]inor (driveable)" in the police report. (Doc. 68-4, Ex. 2.) Vehicle 1, driven by the tortfeasor, was towed from the scene of the accident. (*Id*.)

[4] The driver of Vehicle 2 was not injured in the crash. (Doc. 68-4, Ex. 2.)

benefits file on November 17, 2016, and from that date until March 2017, they received, processed, and paid Sanchez' medical bills stemming for her post-accident hospital visit, subject only to the further processing of medical liens.[5] (Doc. 68-4, Def. Ex. 6.) No claims have been presented to us with respect to the medical payment claim or the property damage claim.

In the weeks following the accident, Sanchez claimed that her "pain intensified and began to travel down her spine and lower back." (Doc. 70 at 5.) She contacted State Farm directly on February 27, 2017, to "advise that her PCP will not treat her because she was involved in an autoloss." (Doc. 68-4, Def. Ex. 6.) She asked the State Farm representative if they could recommend a doctor for her to see because she was still experiencing pain in her neck and back, but she was told that "SF does not recommend doctors to see, but that if she still needs treatment that we will attempt to work with any medical provider she treats with." (*Id.*) Sanchez saw a chiropractor on February 28, 2017. (Doc. 68-4, Def. Ex. 5.) The chiropractor advised that Sanchez "be seen 3 times per week for a period of 6 weeks." (*Id.*) Further, the chiropractor referred Sanchez out for medical consultation and for an MRI of her cervical and lumbar spine. (*Id.*) Sanchez underwent an MRI of her cervical and lumbar spine on March 10, 2017. (Doc. 68-5, Def. Ex. 31.)

On March 6, 2017, Danielle Duffy ("Duffy"), who was retained by Sanchez, wrote to State Farm advising them that she represented Sanchez for her injuries sustained in the October 12, 2016 accident.[6] (Doc. 68-4, Def. Ex. 7.) Duffy instructed State Farm to "open a medical claim as well

---

[5] On March 31, 2017, State Farm received notice of a Pennsylvania Department of Human Services medical assistance lien. The lien had no "specified amount at this time" and the medical benefit specialist "set f/u cal to await final lien amount notification." (Doc.68-4, Def. Ex. 6.) At that point, her file noted that "autopay [was] off" because of the PA DHS lien and instead bills were to be forwarded to "CS for review." (*Id.*)

[6] The record does not indicate when Sanchez first retained Duffy.

as a property damage claim and to acknowledge written receipt of my letter immediately." (*Id*.) She asked State Farm to forward her an "Application for First Party Personal Injury Protection ("PIP") benefits together with the Declarations Page, a Copy of the UM/UIM Waivers, and the Tort Election Form in force on the date of loss." (*Id*.) Ten days later, on March 16, 2017, a State Farm medical benefits claim specialist spoke with Duffy's office and confirmed State Farm's receipt of the letter and acknowledged Duffy's representation of Sanchez. (Doc. 68-3, *Def. Statement of Material Facts* at ¶ 11.) The medical benefits claim specialist also advised Duffy that he would request the documents that she wanted which included the declaration page, the UM/UIM waiver forms, and the tort election form. (Doc. 68-4, Def. Ex. 6.)

On April 26, 2017, a State Farm medical benefits claim specialist spoke with Duffy's office and provided them with the UM/UIM limits and applicable tort status under the policy. (*Id*.) The medical benefits claim specialist noticed however, the documents requested from the underwriting department were not yet received and he sent out another request for the documents. (*Id*.) On June 7, 2017, State Farm received additional medical bills for Sanchez but noted in her file that she had exhausted the $5,000 coverage for medical benefits. (*Id*.) (*See* Doc.1, Pl. Ex. A.)

Nearly nine months later, on January 12, 2018, Duffy sent State Farm a letter enclosing Sanchez' "medical/specials package." (Doc. 68-4, Def. Ex. 9.)  The letter (1) detailed ongoing medical issues Sanchez was facing, (2) requested consent for Sanchez to settle with the tortfeasor's insurance company, and (3) presented State Farm with Sanchez' Under Insured Motorist Claim.[7] (*Id*.)  Duffy elaborated that Sanchez "continues to suffer the effects of this accident more than a

---

[7] The "Demand Package" Duffy presented to State Farm included $8,632.15 in total outstanding medical bills. (Doc. 68-4, Def. Ex. 9.)  The package was "subject to increase." (*Id*.)

year after the fact" and that her condition was getting worse with time. (*Id.*) She stated that, as a result of the accident, Sanchez "sustained significant injuries to her cervical and lumbar spine all of which are permanent in nature and which include, but are not limited to, a herniation with an annular tear at L4-5 and cervical and lumbar radiculopathies." (*Id.*) A neurosurgeon, Dr. Andrew Freese ("Dr. Freese"), recommended that Sanchez "undergo anterior cervical diskectomies and fusions at C4-5, C5-6." (*Id.*) Further, Duffy reported that a physiatrist gave her "cervical and lumbar epidurals."[8] (*Id.*) Duffy then asked for State Farm's consent to settle with the tortfeasor's insurance company ("The General") for its policy limit of $15,000.[9] Duffy continued writing:

> …it is clear that Plaintiff's case is in excess of the policy limits available under the tortfeasor's insurance policy and is likewise, in excess of the UIM policy limits available to him under your policy, which I believe are $15,000. Accordingly, I am asking that you please tender your UIM policy limits on this claim.

(*Id.*) Four days later, on January 16, 2018, a claim specialist was assigned Sanchez' UIM claim and reviewed Duffy's letter. (Doc. 68-3, *Def. Statement of Material Facts* at ¶ 14.) The claim specialist performed several tasks related to the claim, including running a search to see if Plaintiff had any additional policies which could provide coverage and running an asset check on the tortfeasor. (*Id.*) After running the asset check, the claim specialist recommended that permission be granted for Sanchez to accept the tortfeasor's offer to settle. (*Id.*) The claim specialist received

---

[8] The "Demand Package" included payment for bills stemming from both the medical attention provided immediately after the accident at the hospital, and for medical attention received approximately four months to nine months after the accident from a pain management doctor, a chiropractor, and a surgeon. (Doc. 68-4, Def. Ex. 9.)

[9] There is nothing in the briefs or submissions by the parties to indicate Sanchez sought compensation from Vehicle 2's driver or from any associated insurance policy. The police report stated Vehicle 2 was insured. (Doc. 68-4, Def. Ex. 2.)  The police report also described the driver of Vehicle 2 as taking "no contributing action" in causing the accident. (*Id.*)

authority from her supervisor to give Sanchez consent to settle but noted that "proof of The General's limit had not been received" by State Farm. (*Id*.)

Still on January 16, 2018, the claim specialist called Duffy's office to let her know that State Farm was going to fax over the consent to settle and requested a callback from Duffy. (*Id*.) Duffy did not answer but the claim specialist left a message with an employee in Duffy's office. (*Id*.) The claim specialist faxed a letter to Duffy, letting her know that Sanchez had permission to accept the tortfeasor's offer of $15,000. (Doc. 68-4, Def. Ex. 10.)  The letter also confirmed that State Farm was waiving its subrogation rights. (*Id*.) On February 2, 2018, the claim specialist left another message with another employee in Duffy's office requesting Duffy to call back to discuss the UIM claim. (Doc. 68-4, Def. Ex. 14.)

On February 8, 2018, the claim specialist forwarded the underwriting documents to Duffy. (Doc. 68-4, Def. Ex. 11.) On February 19, 2018, Duffy wrote to State Farm requesting a response to her prior UIM policy demand of $15,000. (Doc. 68-4, Def. Ex. 12.) On February 22, the claim specialist faxed a letter to Duffy requesting proof of the tortfeasor's insurance coverage. (Doc. 68-4, Def. Ex. 13.) On February 28, a claim specialist sent Duffy a second letter referencing the fact that Duffy had not called State Farm back, and again noted that proof of the tortfeasor's policy limit with The General was required and had not yet been received. (Doc. 68-4, Def. Ex. 14.)  The claim specialist additionally requested from Duffy "an Affidavit of No Health Insurance in order to consider the out-of-pocket medical expenses included in your demand." (*Id*.)

On March 2, 2018, a claim specialist wrote again to Duffy and provided a copy of the declarations page.  (Doc. 68-4, Def. Ex. 15.)  The claim specialist highlighted that at the time of the accident, there were three vehicles on the policy, and the policy provided for stacking of UM/UIM coverage. (*Id*.) That meant that Sanchez' total coverage would be $15,000 per vehicle

for the three vehicles on the policy, which provided Sanchez with $45,000 of UIM coverage.[10] (Doc. 68-3, *Def. Statement of Material Facts* at ¶ 20.)

Duffy responded with the declarations page from The General providing proof of the tortfeasor's coverage on March 20, 2018. (Doc. 68-4, Def. Ex. 16.) The claim specialist responded to Duffy ten days later, on March 30, acknowledging receipt of proof of the tortfeasor's coverage. (Doc. 68-4, Def. Ex. 17.) The claim specialist also let Duffy know that State Farm was beginning to evaluate the UIM claim, and that State Farm would reach out once its evaluation was complete or if it needed any additional information. (*Id.*)

On the same day, the claim specialist noted in Sanchez' file that there "was a question of causation concerning her annular tear" due to discrepancies between Sanchez' description of her pain, the results of her medical evaluation immediately after the accident, and her description of injuries that she shared with her chiropractor approximately three months later. (Doc. 68-3, *Def. Statement of Material Facts* at ¶ 23) The claim benefit specialist recorded the following:

> Minor damage, per pr, no collision coverage on policy
>
> Approximately 3 month gap in treatment between ER and chiro treatment. The insured denied LOC & back pain in the ER, diagnostic test in ER were negative for acute findings.
>
> The insured presented to chiro approximately 3 months-post accident with new complaints to mid/lower back and reported LOC
>
> Diagnostic tests revealed cervical and lumbar, degenerative changes and an annular tear to the lumbar spine
>
> The insured has denied prior neck and back pain/injuries
>
> ISO is negative for prior MVAs
>
> The insured has selected limited tort

---

[10] Up to this point, Duffy's communications with State Farm showed that she was under the impression that Sanchez only had $15,000 in UIM coverage. (Doc. 68-4, Def. Ex. 12.)

(Doc. 68-4, Def. Ex. 6.) The claim specialist recommended that Sanchez undergo a statement under oath "to give the insured the benefit in consideration for payment under the UIM coverage." (*Id*.) The team manager agreed with the recommendation to take a statement under oath of Sanchez. (Doc. 68-3, *Def. Statement of Material Facts* at ¶ 24.)

### B.  State Farm Investigates Sanchez' Claim

A few weeks later, on April 13, 2018, a claim specialist called Duffy to explain there was a "question of causation" and a question as to whether Sanchez would overcome the limited tort threshold, and as a result, State Farm requested for Sanchez to sit for a statement under oath. (Doc. 68-4, Def. Ex. 6.) Duffy agreed to do so and asked the claim specialist to follow up with Duffy's paralegal because she was going to trial in another matter. (*Id*.) On April 19, the claim specialist followed up with Duffy in writing summarizing their April 13 conversation and informing her that the law firm of Ferry Ullman would conduct the statement under oath. (Doc. 68-4, Def. Ex. 18.) On May 4, a Ferry Ullman attorney, Christin Kochel ("Kochel"), wrote to Duffy and provided medical authorizations so that Sanchez' medical treatment records could be obtained and asked Duffy to have Sanchez sign them. (Doc. 68-4, Def. Ex. 8 and 19.) The same day Kochel sent Duffy a notice that the statement under oath would take place July 18, 2018. (Doc. 68-4, Def. Ex. 1 at ¶ 35.) Plaintiff requested an earlier date so the statement under oath was moved to July 9.[11]

Plaintiff did not sign the seven medical authorizations until July 9, 2018, the day the statement under oath was conducted. (Doc. 68-4, Def. Ex. 8.) On July 11, 2018, State Farm forwarded the

---

[11] Plaintiff takes issue with how far in advance the statement under oath was scheduled. (Doc. 68-4, Def. Ex. 1 at ¶ 35-36.) She asserts in her complaint that she requested a sooner date, and was given one for July 9, 2018 but that it was "still more than two months after the initial notice and request." (*Id*. at ¶ 36.)

authorizations to Plaintiff's medical providers and requested the documents be returned to State Farm within 20 days. (Doc. 68-4, Def. Ex. 20.) State Farm forwarded the medical records it received from Sanchez' providers to Duffy as it received them. (Doc. 68-3, *Def. Statement of Material Facts.*) On July 20, Duffy wrote to Kochel to "confirm her client will accept tender of her available UIM policy" which she believed now to be $45,000, and to "[p]lease advise to what, if anything, State Farm requires" to tender the UIM benefits. Kochel responded three days later and explained:

> We just obtained several authorizations from Ms. Sanchez on July 8, 2008 [sic] at her Statement Under Oath to obtain her records. Once we receive the records from these authorizations, we plan on having Ms. Sanchez undergo an IME. Therefore, once we have completed such discovery, we will be in a better position to fully assess Ms. Sanchez' claim.

(Doc. 68-4, Def. Ex. 21.)

Duffy responded by asking when the IME would be scheduled and, a day later, Kochel replied that the IME would take place once Sanchez' physicians provided her medical records per the signed authorizations. (Doc. 68-4, Def. Ex. 23 and 24.) In addition to the initial seven authorizations for medical records, Kochel wrote to Duffy in late July and August asking Sanchez to sign three additional releases for medical providers.[12] (Doc. 68-4, Def. Ex. 8.) Kochel did not hear from Duffy regarding these three releases until October 19, 2018. (*Id.*) On December 3, 2018, Kochel wrote to Duffy to sign an additional release for a different medical provider.[13]  (*Id.*) Kochel received no response from Duffy and followed up in writing on December 17, 2018, January 14,

---

[12] Neither party explains nor raises an issue with why these three additional releases were not presented to Sanchez contemporaneously with the other seven releases on July 9.

[13] Neither party explains nor raises an issue with why this additional release was not presented to Sanchez contemporaneously with the other seven releases on July 9 or with the other three releases in late July and August.

2019, February 6, 2019, and February 27, 2019. (Doc. 68-4, Def. Ex. 8.) On February 27, 2019, Duffy provided Kochel with the final signed medical release authorization. Despite making multiple attempts, Kochel did not receive those medical records from the final provider until May 20, 2019. (Doc. 68-4, Def. Ex. 27.)

### C.  The Independent Medical Examination and State Farm's Settlement Offer

On June 10, 2019, after Kochel received all requested medical records from Sanchez' providers, she and the CMA group reached out to Duffy suggesting potential dates for an Independent Medical Examination ("IME"). (*Id*.) On July 1, 2019, it was confirmed that the IME would take place on July 29, 2019. (Doc. 68-4, Def.  Ex. 29*.)*  Four days before that date, Sanchez canceled and the parties rescheduled the IME for August 26, 2019. *(*Doc. 68-4, Ex. 8.)  The IME took place as scheduled on August 26 and was conducted by Dr. Meller, an orthopedic surgeon. (*Id*.) In his eight-page report, Dr. Meller ultimately found that as a result of the accident, Sanchez sustained, at most, a minor whiplash injury and that her back pain was not caused by the automobile accident. (Doc. 68-5, Def. Ex. 31.) Dr. Meller also found that "there has been no structural abnormality which can be causally related to the accident" and "no permanent impairment to bodily function." (*Id*.) Dr. Meller authored an addendum report in response to submissions from Sanchez and affirmed his conclusions that her back pain was not caused by the accident. (Doc. 68-4, Def. Ex. 34.)

On September 3, 2019, Sanchez filed this lawsuit against State Farm in this Court. (Doc. 1.) On October 24, 2019, based on the results of the investigation, State Farm offered Sanchez $6,000 over and above the tortfeasor's $15,000 to come to a gross valuation of $21,000. (Doc. 68-4, Def. Ex. 8.) Sanchez rejected the offer. (*Id*.)

### III.    LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" when "a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of [its] burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citations omitted). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party bears its burden, "the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In doing so, the non-moving party must provide more than "[u]nsupported assertions, conclusory allegations, or mere suspicions" to overcome a motion for summary judgment. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Instead, the non-moving party must present particular facts and "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. Accordingly, "the moving party may meet its burden by showing that the nonmoving party has failed to produce evidence sufficient to establish the existence of an element essential to its case." *Alvord–Polk, Inc. v. Schumacher & Co.*, 37 F.3d 996, 1000 (3d Cir. 1994).

## IV.    DISCUSSION

Now that we have set out the relevant facts and proper legal standard to resolve this MSJ, we next turn to the parties' arguments and our analysis of those arguments. Defendant seeks summary judgment on Plaintiff's bad faith claim. Sanchez asserts State Farm acted in bad faith in that: (1) they took too long to both initiate and conduct the investigation, (2) their settlement offer was unreasonably low, and (3) they failed to meet industry standards in several other ways throughout the investigation. (Doc. 70 at 4, 10.)

Pennsylvania law governs and has defined "bad faith" in the insurance context to mean:

> any frivolous or unfounded refusal to pay proceeds of a policy. For purposes of an action against an insurer for failure to pay a claim, such conduct imparts a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self interest or ill will; mere negligence or bad judgment is not bad faith. [14]

*Northwestern Mut. Life Ins. Co. v. Babayan,* 430 F.3d 121, 137 (3d Cir.2005) (quoting *Terletsky v. Prudential Prop. & Cas. Ins. Co.,* 649 A.2d 680, 688 (Pa. Super. 1994). "Bad faith claims are

---

[14] Pennsylvania law provides a statutory remedy for cases of bad faith:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorneys fees against the insurer.

42 Pa.C.S.A. § 8371. While Pennsylvania courts often look to § 8371 in ruling on bad faith claims, this statute provides guidance exclusively on damages. First, we must determine *if* bad faith exists before potentially relying on § 8371. To determine if State Farm acted in bad faith, we look to how Pennsylvania courts, and courts in this Circuit applying Pennsylvania law, have defined bad faith. The Pennsylvania Superior Court has explained the bad faith statute extends specifically to the handling of UIM claims. *Condio v. Erie Ins. Exch.,* 899 A.2d 1136, 1142 (Pa. Super. 2006).

fact specific and depend on the conduct of the insurer *vis à vis* the insured." *Rhodes v. USAA Cas. Ins. Co.*, 21 A.3d 1253, 1261 (Pa. Super. 2011) (internal citation omitted).

To succeed in a bad faith claim, the plaintiff must prove the existence of two elements: "that the defendant did not have a reasonable basis for denying benefits under the policy and that the defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Terletsky,* 649 A.2d at 688.[15]   The plaintiff has the burden of proving both elements of a bad faith claim by clear and convincing evidence.  *Klinger v. State Farm Mut. Auto. Ins. Co.,* 115 F.3d 230, 233 (3d Cir. 1997). "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Sylvester*, A.2d 1202, 1203-04 (Pa. 1989). Accordingly, "to defeat a motion for summary judgment, plaintiff must present sufficient evidence such that, if believed, a jury could find bad faith under the clear and convincing evidence standard."  *Greco v. Paul Revere Life Ins. Co.,* 1999 WL 95717, at *3 (E.D. Pa. Feb.12, 1999).

Here, the question is whether Sanchez has proven by clear and convincing evidence that State Farm acted in bad faith. For the reasons that follow, we find that she has not.  Viewing the evidence in the light most favorable to her, and considering the proffered expert report, we are persuaded

---

[15] Under the two-part test from *Terletsky*, in addition to an insurer's denial of benefits, an insurer's delay can also be a basis for bad faith. For a plaintiff to prevail on what we refer to as a "bad faith delay" claim, the insured must prove that the insurer "(1) 'had no reasonable basis for causing the delay' and (2) 'knew or recklessly disregarded the lack of a reasonable basis for the delay.'" *Parisi v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 2107774, at *11 (W.D. Pa. May 7, 2018) (quoting *Mirachi v. Seneca Specialty Ins. Co.*, 564 F. App'x 652, 655-56 (3d Cir. 2014)). *See also Tomaszewski v. Allstate Ins. Co.,* 2022 WL 16553375, at *16 (E.D. Pa. Oct. 28, 2022) (granting summary judgment to defendant on a bad faith claim after applying the "bad faith delay" test).

that no reasonable jury could examine the record and conclude that, by clear and convincing evidence, State Farm acted in bad faith in their handling of her UIM claim. Bad faith exists only if Sanchez proves both prongs of the *Terletsky* test by clear and convincing evidence. She has not done so here.

Sanchez sets out three arguments concerning State Farm's alleged bad faith in support of her bad faith claim: (1) they took too long to both initiate and conduct the investigation, (2) their settlement offer was unreasonably low, and (3) they failed to meet industry standards in several other ways throughout the investigation. As we set forth below, State Farm had a reasonable basis for conducting the investigation, it acted reasonably throughout the investigation, and it had a reasonable basis for denying full benefits under the policy due to the findings of the investigation.[16]

### A. The Investigation

Although bad faith in the insurance context is usually related to the unreasonable and reckless refusal to pay out benefits, it "need not be limited to the literal act of denying a claim." *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 506 (3d Cir. 2004) Bad faith can also encompass conduct during investigations and litigation if such conduct contributes to the "unreasonable and intentional (or reckless) denial of benefits." *UPMC Health Sys.,* 391 F.3d at 506 (citing *O'Donnell v. Allstate*, 734 A.2d 901 (Pa. Super. 1999)). Conduct such as undertaking a "lack of good faith

---

[16] Proving that the underinsured tortfeasor was the actual and proximate cause of Sanchez' injury is a prerequisite for State Farm being required to pay UIM benefits. The Third Circuit has stated that if the insured has no right to recover damages from the tortfeasor, the insurance company "has no responsibility to pay under its policy." *Willet v. Allstate Ins*., 359 F. App'x 349, 351 (3d Cir. 2009). UIM coverage thus creates a form of derivative liability, "binding the UIM insurer to the liability of the tortfeasor." *Renner v. Progressive N. Ins.*, 2014 WL 1091359, at *3 (E.D. Pa. Mar. 18, 2014) (citing *Willet*, 359 F. App'x at 351). Accordingly, Sanchez can recover from State Farm only what she could have recovered from the tortfeasor; State Farm has no contractual obligation to provide UIM benefits unless it is proven that the tortfeasor's negligence caused Sanchez' injuries.

investigation into facts, and failure to communicate with the claimant" can be sufficient for a finding of bad faith. *Romano v. Nationwide*, 646 A.2d 1228, 1233 (Pa. Super. 1994). An insurer has an obligation to conduct a good faith investigation of an insured's claim. *See Baum v. Metro. Prop. & Cas. Ins. Co.*, 2019 WL 4689024, at *5 (W.D. Pa. 2019) ("The insurance company must conduct a meaningful investigation, which may include an in-person interview, examination under oath, medical authorizations, and/or medical examinations.") (internal citation omitted).

It is no secret that the "process for resolving an insurance claim can be slow and frustrating." *Baum*, 2019 WL 4689024, at *6.  To defeat a claim of bad faith,

> [t]he insurance company is not required to show that the process used to reach its conclusion was flawless or that its investigatory methods eliminated possibilities at odds with its conclusion. Instead, the insurance company is only required to show that it conducted an investigation sufficiently thorough to yield a reasonable foundation for its action.

*Visconte v. Liberty Mut. Grp.*, 2012 WL 6524980, at *6 (E.D. Pa. Dec. 14, 2012) (internal citation omitted). Therefore, an insurer's "substantial and thorough investigation of an insurance claim, forming the basis of the company's refusal to make payments, establishes a reasonable basis that defeats a bad faith claim as a matter of law." *Visconte,* 2012 WL 6524980, at *6.

### 1.  The Parties' Arguments

Sanchez asserts State Farm acted in bad faith in taking too long to both initiate and conduct an investigation. She argues that an insurer has a responsibility to act in the "utmost good faith" towards its insureds and that by conducting an unreasonably long investigation, State Farm did not fulfill that responsibility. [17] (Doc. 70 at 8.)  Plaintiff contends that bad faith can extend to an insurer's conduct during an investigation, which can include "an unreasonable delay in handling

---

[17] *Romano,* 646 A.2d at 1231 (internal citation omitted).

claims; a frivolous or unfounded refusal to pay; a failure to conduct a proper investigation into the claim; acting in a dilatory manner; and settlement offers which bear no reasonable relationship to the insured's reasonable medical expenses." (*Id.*)  She argues that State Farm received notice of a potential claim in March 2017 and they should have started investigating and evaluating the claim then, instead of ten months later in January 2018. (*Id.* at 9.) Instead, she contends, State Farm "unreasonably and unnecessarily delayed Ms. Sanchez' claim through October 2019 when a low-ball offer was extended to Plaintiff's counsel." (*Id.*) "Despite having a significant volume of medical records provided by Plaintiff's counsel," State Farm required Plaintiff to provide a statement under oath, authorize the release of relevant medical records, and undergo a medical examination. (*Id.* at 11.) Plaintiff takes issue with the fact that it took State Farm over a year to receive the medical records they wanted from her medical providers despite already having the "majority" of her records. (*Id.*)

State Farm asserts that once Sanchez presented her UIM claim in January 2018, they promptly acknowledged their receipt and one of their claim specialists noted a potential issue of causation and initiated an investigation. (Doc. 68-2 at 18.) That investigation, led by outside counsel, included taking the statement under oath, obtaining medical records from Sanchez' various providers, and having an orthopedic surgeon review those medical records and perform a subsequent medical evaluation. (*Id.* at 19.) State Farm highlights the fact that Sanchez and Duffy were actively a part of the investigation, making them aware that their evaluation of the claim was ongoing. (*Id.*)

State Farm contends their decision to investigate was warranted because in January 2018 Sanchez was "claiming injury to both her cervical and lumbar spines" whereas in the hospital immediately after the accident, Sanchez specifically denied back pain and diagnostic testing was

negative for any acute findings of a back injury.[18] (*Id*. at 16.)  To support their decision to investigate, State Farm highlights that there was a four-and-a-half-month gap between Sanchez' treatment in the ER on October 12, 2016 and when she first saw a chiropractor on February 28, 2017.[19] (*Id*. at 16, 19.)  Further, more recent diagnostic testing from March 2017 "revealed cervical and lumbar degenerative changes and an annular tear to her lumbar spine" whereas diagnostic testing conducted immediately after the accident on October 12, 2016 "were negative for any acute finding." (*Id*. at 16.)

In its reply, State Farm denies Sanchez' contention that they were placed on notice of the UIM claim on March 6, 2017. (Doc. 71 at 1.)  They point to Duffy's letter on January 12, 2018, which stated "I am seeking your consent to settle with The General for $15,000 and **to present to you my client's Underinsured Motorist Claim**." (*Id*.) (emphasis in original.) State Farm argues that Plaintiff's March 6, 2017 letter to them "in no way put State Farm on notice because that letter "requested that only a medical claim as well as a property damage claim" be opened. (*Id*.) (internal citations omitted.) State Farm does not open a UIM claim if an insured only asks for forms/documents related to coverage under a policy. (*Id*. at 2.) State Farm reiterates that they had "a reasonable basis to investigate the claim," as the accident appeared to be minor based on the police report and photographs taken of the vehicle. (*Id*. at 3.) In addition, the emergency room

---

[18] State Farm "questioned the causation due to the minimal damage to the vehicle. We questioned because of the gap in treatment. We questioned about in the E.R. there was no mention of back pain." (Doc. 68-6, Kushnerock Dep. 106:9-13.)

[19] In its Statement of Material Facts, State Farm asserts the amount of time between the accident and when Sanchez saw a chiropractor was three months, not four-and-a-half months, as it did in its MSJ. (*See* Doc. 68-3, *Def. Statement of Material Facts* at ¶ 23.) The evidentiary record shows Sanchez saw a chiropractor on February 28, 2017, approximately four-and-a-half months after the October 12, 2016 accident. (Doc. 64, Def. Ex. 5.)

records noted Plaintiff only complained of neck pain and not back pain, and all diagnostic tests were negative. (*Id.*)

### 2. Analysis

We accept that under *Terletsky* and its progeny, for Plaintiff to succeed on a "bad faith delay" claim, Defendant must have "(1) 'had no reasonable basis for causing the delay' and (2) 'knew or recklessly disregarded the lack of a reasonable basis for the delay.'" *Parisi v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 2107774, at *11 (W.D. Pa. May 7, 2018) (quoting *Mirachi v. Seneca Specialty Ins. Co.*, 564 F. App'x 652, 655-56 (3d Cir. 2014)). We start by noting that the accident was on October 12, 2016. It is undisputed that on March 6, 2017, nearly five months after the accident, Duffy reached out to State Farm explicitly asking them to open a medical claim file and property damage claim file, as well as requesting a UIM/UM waiver. (Doc. 68-4, Def. Ex. 7.)   It is also undisputed that Sanchez presented her UIM claim to State Farm on January 12, 2018. (Doc. 68-4, Def. Ex. 9.)

However, Sanchez categorizes the March 6, 2017 letter as putting State Farm on "constructive notice" of a claim. (Doc. 70 at 4.)  While not directly articulated, she infers from her argument that, at that time,  State Farm had a duty to initiate an investigation into the claim. (*Id.*) On this point, we do not find Plaintiff's argument compelling. As of March 6, 2017, Sanchez had merely inquired about UIM coverage and asked for additional information. She did not present her claim to State Farm until January 12, 2018, and, four days after receiving the substantive claim, State Farm initiated a good faith investigation. *In Shaffer v. State Farm Mut. Auto. Ins. Co.*, 643 F. App'x 201, 205 (3d Cir. 2016), plaintiffs argued the insurer should have initiated a UIM claim on their behalf after an accident and because it failed to do so, it acted in bad faith. The Third Circuit affirmed the District Court's grant of summary judgment for the insurer and explained that "it was

not unreasonable for State Farm to delay opening a UIM claim until after being notified by the Shaffers' attorney that such a claim would be pursued." *Shaffer*, 643 F. App'x at 205. Plaintiff's counsel had reached out to the insurer to inquire about UIM coverage and ultimately presented a UIM claim at a later date. *Id*. Here, like the attorney's inquiry to the insurer in *Shaffer*, Duffy's initial inquiry about coverage was just that: an inquiry. It did not put State Farm on notice to open a claim. Duffy did not present her claim until January 2018, at which time State Farm had responsibility to act on the claim. They did so. Given the foregoing, we are unable to accept Plaintiff's position that State Farm acted in bad faith by failing to initiate an investigation in March of 2017.

As to Sanchez' argument that State Farm's investigation took too long*,* we acknowledge that the claim was opened in January 2018 and the IME was conducted in August 2019.  To support the contention that a lengthy investigation into a claim can rise to the level of bad faith, Plaintiff cites to *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224 (3d Cir. 2005). In that case, the Third Circuit affirmed the District Court's finding that an insurer's "intentional[] stonewalling" was "reckless and obstructive" and therefore constituted bad faith. *Willow Inn, Inc*., 399 F.3d at 233 (internal citation omitted). In *Willow Inn*, it was undisputed that a tornado severely damaged the insured property. *Id*. at 227. In addition to a list of "purposefully indifferent action[s]" taken, the insurer did not acknowledge the request to open a claim for three months, did not commence an appraisal for eight months, asked the insured for documentation already provided, froze the appraisal process without good cause, and withheld pre-payment on unreasonable grounds. *Id*. at 229, 233.

We find Plaintiff's comparison to *Willow Inn* to this case unpersuasive. There, the insured experienced "sustained resistance" rather than "cooperation" from the insurer while that claim was

being processed. *Id*. at 227. Here, State Farm's actions do not resemble the "reckless and obstructive" actions taken by the insurer in *Willow Inn* because State Farm managed the claim and communicated with Sanchez.  The unrefuted timeline of the investigation shows that State Farm monitored the claim regularly and attempted to keep the matter moving along throughout the investigation, particularly with respect to securing medical records. Such is demonstrated by the 40 pages of entries in the State Farm Claim log that certainly would belie any suggestion that State Farm demonstrated no involvement in the claim progression. (Doc. 68-4, Def. Ex. 6.)

On May 4, 2018, State Farm provided Duffy with seven medical authorizations for Sanchez to sign. Duffy did not return the signed medical authorizations until July 9, 2018, over two months later.  Any delay in starting to collect medical records from Sanchez' providers, therefore, cannot be attributed to inaction on State Farm's part. Two days later, State Farm sent the authorizations to the medical providers to collect Sanchez' medical records. They requested that the providers send Sanchez' records within twenty days. State Farm then sought three additional releases for medical providers in late July and August. Duffy did not return the signed authorizations regarding these three releases until October 19, 2018. State Farm provided Duffy with the final medical authorization on December 3, 2018. Duffy did not return the signed release to State Farm in late February 2019, despite State Farm sending her four reminder letters to do so. (Doc. 68-3, *Def. Statement of Material Facts* at ¶ 52.)  Sanchez' failure to return the signed releases caused months-long delay; a delay she attempts to attribute State Farm in her bad faith claim. Further, Sanchez canceled her IME on July 29, 2019 with four days' notice.  The parties rescheduled for a month later. Again, Sanchez' own action delayed the investigation another month.

We recognize that it took over a year for State Farm to receive all of Sanchez' medical records. However, we highlight the absence of any evidence showing that Plaintiff herself contacted the

medical providers to expedite the collection of her own medical records. Instead, State Farm followed up with the providers who had not returned the requested medical records. State Farm followed up with one such provider three times in writing requesting the records before the provider released them months after they were initially requested.  (Doc. 68-3, *Def. Statement of Material Facts* at ¶ 54.) Plaintiff could have reduced or even eliminated this delay in collecting her medical records by simply reaching out to her providers. This she did not do.

State Farm's processes and investigation need not be flawless.  The delay in the investigation was directly attributable to gathering medical records so that State Farm could properly determine the extent to which the injuries could be said to have been caused by the accident. State Farm exhibited neither a lack of good faith investigation into the facts nor a failure to communicate with the claimant throughout the investigation, as could support a finding of bad faith. The State Farm Communication Log and correspondences between the parties show they kept Duffy apprised of the status of the investigation on a regular basis.[20]

The foregoing facts cannot be described as "sustained resistance" on the part of State Farm when the delays were attributed to Sanchez herself or her medical providers. As we have set out within, Sanchez fails to provide the Court with evidence that State Farm's delays and intention were anything other than what they presented it to be: an investigation into Sanchez' medical history to properly determine the value of the UIM claim. Given the foregoing, we are unable to accept Plaintiff's position that State Farm acted in bad faith in conducting the investigation.

**B. The Settlement Offer**

      **1. The Parties' Arguments**

---

[20] *See* Background *supra* Part II.B-E.

Sanchez asserts that State Farm's unreasonably low settlement offer violates an insurer's duty to act in the "utmost good faith" towards its insureds.[21] To support the contention that State Farm's settlement offer was offensively low, she points to the fact that they "would have been put on notice that a surgery was likely and necessary for Ms. Sanchez as a result of the injuries sustained" and that she has had to "undergo various medical treatments". (Doc. 70 at 5.) Sanchez also argues that State Farm ignored her treating physician's opinion that she needed back surgery. (*Id.* at 10.) She points to the fact that the estimated cost of the surgery was higher than State Farm's $45,000 stacked policy limit. (*Id.* at 11.) Accordingly, Sanchez concludes State Farm's $6,000 settlement offer, on top of the $15,000 contribution from the tortfeasor, was a "low-ball offer." (*Id.* at 9, 11-12.) In response, State Farm contends that once the IME was completed, they analyzed the findings, and within weeks, extended a settlement offer to Plaintiff "consistent with the results of the investigation." (Doc. 71 at 3.)

## 2. Analysis

We are unable to accept Plaintiff's position that State Farm acted unreasonably in their evaluation of the claim. This Court has recently noted that "[d]isagreement over the amount of the settlement of a UIM claim is not unusual." *Tomaszewski v. Allstate Ins. Co.,* 2022 WL 16553375, at *14 (E.D. Pa. Oct. 28, 2022). "As the Pennsylvania Superior Court has indicated, it is improper to find that an insurer operated in bad faith where there is 'a normal dispute between an insured and an insurer over the value of a UIM claim.'" *Tomaszewski,* 2022 WL 16553375, at *14 (quoting *Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 785 (Pa. Super. 2009). We are reminded that "[a]

---

[21] *Romano*, 646 A.2d at 1231.

reasonable basis is all that is needed to defeat a claim of bad faith." *J.C. Penney Life Ins. Co. v. Pilosi,* 393 F.3d 356, 367 (3d Cir. 2004).

To stand for the proposition that extending a "low-ball" offer with no reasonable relation to the insured's losses can constitute bad faith, Plaintiff relies on *Parisi v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 2107774 (W.D. Pa. May 7, 2018). (Doc. 70 at 8.) In *Parisi*, the court denied cross-motions for summary judgment on bad faith between an insurer and their insured because genuine issues of material fact existed. 2018 WL 2107774, at *12. In denying the insurer's motion for summary judgment, the court concluded that a reasonable jury could find insurer acted in bad faith in its settlement tactics. *Id*. at *15. "[D]espite acknowledging causation and liability," they took "little—if any—action" on the claim for six months and did not offer to settle. *Id*. at *14.  They did, however, determine the proper value the claim as being between $46,800 and $61,800. *Id*. at *15. In applying the tortfeasor's policy limit of $15,000, the insurer's coverage totaled $31,800 *at minimum*. *Id*. (emphasis added). Instead, the claims specialist only received authority to offer up to $26,800 but the specialist ultimately offered the insured only $17,000. *Id*. The court categorized both the offer and the settlement authority, both of which fell below the minimum value of the claim, as an unreasonable measure of the insured's true damages, and therefore concluded that a jury could find a clear and convincing showing of bad faith. *Id*.

Critically, in *Parisi*, the insurer acknowledged the insured's head injuries were a direct result of the car accident in that case. *Id*. at *1, *14. Here, State Farm questions the cause of Sanchez' back injuries, leaving it with a need to investigate to see if the back injury was causally related to the accident and whether she was entitled to the benefit of the policy. State Farm asserts that its offer is in line with the results of IME report, where a physician found Sanchez' back injuries were not a result of the accident. (Doc. 68-2 at 20.) State Farm's settlement offer of $6,000, when

combined with the $15,000 coverage from the tortfeasor's policy, represented a valuation of $21,000 for Plaintiff's claim. Plaintiff's initial medical demand package was for $8,632.15, but it did not include the cost of any potential future surgery. We recognize that when Duffy asked a State Farm claim specialist in her deposition if back surgery, like the one Dr. Freese recommended for Sanchez, would cost more than the stacked $45,000 policy limit, the claim specialist answered in the affirmative. (Doc. 70-13, Smith Dep. 176:5-11.) However, Sanchez fails to consider that the cost of that surgery, or the cost of any future treatment, comes into play only where she can prove that the need is directly associated with the injuries caused by the accident.[22]

We are satisfied that State Farm conducted a proper investigation into Sanchez' claim. It included an examination under oath, the collection of medical records from eleven different providers, and an IME. That investigation provided State Farm with a reasonable basis to find that Sanchez' back injury was not caused by the accident. The lack of causation led State Farm to value the claim at $21,000. Plaintiff has failed to show that State Farm lacked a reasonable basis for denying further benefits under the policy.

### C.  Other Alleged Problematic Conduct

Now that we have concluded that State Farm did not act in bad faith in (1) initiating and conducting the investigation and (2) valuing the claim at $21,000, we now address Plaintiff's contention that (3) State Farm failed to meet industry standards in several other ways throughout the investigation. To support her position, she relies upon her bad faith expert's report, which

---

[22] *See* Doc. 68-6, Kushnerock Dep. at 102-106.

concludes that State Farm's conduct "fell well below minimum acceptable industry standards."[23] (Doc. 70 at 10.)

Her proffered expert highlights six ways in which State Farm's handling of the claim fell below industry standards thereby causing "undue and unreasonable delay." (*Id*.; *See* Doc. 70. Pl. Ex. 12)[24] First, Plaintiff asserts that State Farm failed to "investigate the physical damages to the vehicles involved in the accident yet relied heavily upon their conclusion that it involved 'minor damage.'" (Doc. 70 at 10.) Second, Plaintiff alleges delaying the payout allowed State Farm to increase its "float," which State Farm used to increase its net income, showing a self-interest to move slowly in performing the investigation. (*Id*. at 12.)  For both arguments, Plaintiff provides no additional facts or reasoning in support of how either of these actions rise to a clear and convincing showing of bad faith. Accordingly, we reject these arguments as speculative.

Sanchez' final argument is that State Farm's evaluation of the claim "included a racially biased assessment of how a jury would perceive Ms. Sanchez because she only spoke Spanish." (Doc. 70 at 12.) Plaintiff points to the fact that, according to the deposition of the claim specialist who worked on Sanchez' claim, State Farm trained their employees to "examine the venue where a lawsuit might be filed against State Farm" if an insured party brought a claim. (Doc. 70-13, Smith Dep. 208:8-11.)  The examination included determining whether the venue was a liberal or conservative one, as that could impact a jury's potential damages award. (*Id*. at 209:9-19.) The claims specialist noted in the State Farm Claim Log:

---

[23] We observe that the expert, Stuart Setcavage ("Setcavage"), has not at this stage had his opinions subject to scrutiny required by *Daubert v. Merrell Dow Pharm*., 509 U.S. 579 (1993).

[24] Three of these six instances have been discussed in our analysis of State Farm's investigation and settlement offer. *See* Discussion *supra* Part IV.A-B.  We discuss the remaining three here.

> Miss Solano-Sanchez will not make a good witness as she did not answer the questions asked of her and had to have the questions repeated to get an answer to the question. Also Berks County is a conservative venue. A jury will be frustrated that she only speaks Spanish.[25]

(*Id.* at 210:22-211:4.)

In response, State Farm argues Setcavage's opinion does not raise a genuine issue of material fact. (Doc. 71 at 4.) They urge the Court to ignore the opinion of Setcavage because the court has the discretion to do so in cases of bad faith. (*Id.*) Even if the Court considers Setcavage's opinion, however, he provides no information that would preclude the Court from granting summary judgment. (*Id.* at 5.)

The Court "has considerable discretion to accept or reject an expert's conclusions on the question of bad faith." *Shaffer v. State Farm Mut. Auto. Ins. Co.,* 643 F. App'x 201, 205 (3d Cir. 2016) (relying on *Seese v. Volkswagenwerk A.G.,* 648 F.2d 833, 844 (3d Cir.1981)). We are mindful under Federal Rule of Civil Procedure 702, an expert can testify if their "specialized knowledge" helps the factfinder "determine a fact in issue." Fed.R.Evid. 702. In doing so, the proponent of the evidence would be obligated to demonstrate that it is predicated upon "sufficient facts or data," that it is "the product of reliable principles and methods," and that the expert "reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702.

Here, we reject Plaintiff's invitation to evaluate whether State Farm complied with industry standards, as opposed to the proper legal standard to determine whether an insurer has acted in bad faith.[26] *(Doc. 70, Pl. Ex. 14.)* Accordingly, because Setcavage interprets the same facts before us

---

[25] This entry was not part of the State Farm Communication Log provided by Defendants (Doc. 68-4, Def. Ex. 6.) However, the claim specialist answered in the affirmative when asked if she wrote that entry into the claim log. (Doc. 70-13, Smith Dep. 210:17.)

[26] "In a case where bad faith is alleged, industry standards are irrelevant because '[b]ad faith is a legal concept of general application.'" *Scott v. Geico Gen. Ins. Co.*, 2013 WL 6055221 at *4 (M.D.

and uses those facts to come to a legal conclusion about State Farm's adherence to the industry standard, we do not find that his opinions assist the Court in determining if State Farm conducted itself in bad faith.[27]  Therefore, as his opinions do not help us "determine a fact in issue," we will the opportunity to consider his opinions at this time.

With regard to Sanchez' final argument that State Farm was racially biased, she fails to show how (1) State Farm's consideration of a potential jury pool constitutes a prima facie showing of bad faith or, in the alternative, how (2) considering a jury's potential perception of her impacted State Farm's valuation of her claim such that they acted in bad faith. On the first point, we find no law in this Circuit to support the proposition that considering how a potential jury pool will perceive a litigant constitutes a prima facie showing of bad faith. On the second point, Sanchez fails to shed light on how an entry in the claim file about Berks County being a conservative venue resulted in her claim being improperly processed and valued. We are left to speculate as she provides no consideration of how jurors are selected and how the voir dire process is designed to eliminate jurors with improper bias. Smith testified under oath that State Farm does not train its employees to consider an insured's language or nationality in evaluating a claim and, further, that she did not value Sanchez' claim differently merely because she had difficulty speaking English. (Doc. 70-13, Smith Dep. 210:2-11.)   Kushnerock testified to the same. (Doc. 68-6, Kushnerock Dep. 117:16-19, 119:22-121:4.) Kushnerock and Smith testified that State Farm valued the claim

---

Pa. Nov. 15, 2013) (quoting *Dattilo v. State Farm Ins. Co.*, 1997 WL 644076, at *5 (E.D. Pa. October 17, 1997)*, aff'd,* 168 F.3d 478 (3d Cir. 1998).

[27] *See Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 595 (E.D. Pa. 1999), *aff'd*, 234 F.3d 1265 (3d Cir. 2000) ("The mere presence of an expert opinion supporting the non-moving party does not necessarily defeat a summary judgment motion; rather, there must be sufficient facts in the record to validate that opinion.") (internal citations omitted).

at $21,000 due to the results of the IME. While we recognize that implicit bias is prevalent in society, we have no reason to conclude that State Farm was in bad faith in failing to consider "racial bias" in its evaluation of the claim.

## V.   CONCLUSION

Our examination of the parties' submissions reveals that the evidence produced by Sanchez is insufficient to allow a reasonable jury to find that State Farm acted in bad faith. Even when viewed in the light most favorable to Sanchez, the evidence, including the police report, Sanchez' medical records, the State Farm Claim Log, and the correspondences between the parties, does not establish a clear and convincing showing that State Farm lacked a reasonable basis for either their investigation into the claim or their settlement offer. Accordingly, Sanchez has not raised a genuine issue of material fact as to whether State Farm acted in bad faith. For the foregoing reasons, State Farm's partial MSJ as to Count III – Bad Faith is **GRANTED**. An appropriate Order follows.